**Ruth KOEHLER, Plaintiff–Appellant,**

v.

**COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING, Defendant–Appellee.**

No. 09CA1965.

Colorado Court of Appeals, Div. VII.

Dec. 23, 2010.

Deborah L. Wagner, Greeley, Colorado, for Plaintiff-Appellant.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Anne Baudino Holton, First Assistant Attorney General, Gary L. Armstead, Assistant Attorney General, Denver, Colorado, for Defendant-Appellee.

Opinion by Judge RICHMAN.

Pursuant to section 24–4–106(9), C.R.S. 2010, plaintiff, Ruth Koehler, seeks judicial review of the district court's judgment upholding the decision of the Colorado Department of Health Care Policy and Financing (the Department) to terminate Koehler's benefits under Medicaid Home- and Community–Based Services for the Elderly, Blind and Disabled (HCBS). Because the termination was based on a Department regulatory definition that is inconsistent with the purpose of the federal statutory definition, we reverse the court's judgment.

### I. Background

Koehler, an elderly disabled woman, qualified for and received HCBS, a Medicaid program that provides home-based services for the elderly, blind, and disabled. *See* 42 U.S.C. § 1396n(c)(1) (2010); §§ 25.5–6–301 to –313, C.R.S.2010. The purpose of the program is to provide necessary assistance to recipients as an alternative to nursing facility placement. § 25.5–6–302. While she was receiving HCBS, Koehler's husband resided in a nursing home and was receiving Medicaid assistance and Social Security benefits. Although her husband's Social Security benefits would ordinarily be taken to pay for his nursing home care, Koehler's income was sufficiently low that she received part of her husband's Social Security benefits as a "community spouse monthly income allowance" (CSMIA) as provided under the Medicaid statute. *See* 42 U.S.C. § 1396r–5(d)(1)(B).[1]

A CSMIA is a benefit established under the "spousal impoverishment provisions" of the Medicaid Catastrophic Care Act (MCCA), which provides financial assistance to the at-home spouse of an institutionalized person. The at-home spouse is referred to as a "community spouse." § 1396r–5(d)(1)(B). Congress enacted the MCCA in order to "protect married couples when one spouse is institutionalized in a nursing home, so that the spouse who continues to reside in the community is not impoverished and has sufficient income and resources to live independently." *See* H.R.Rep. No. 100–105(II),

---

1. Neither party disputes that Koehler's husband financially qualified for Medicaid and that Koehler financially qualified for spousal allowances and HCBS.

100th Cong., 2d Sess. at 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 888. As stated in *Wisconsin Department of Health & Family Services v. Blumer,* 534 U.S. 473, 480, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002):

> In the MCCA, Congress sought to protect community spouses from "pauperization" while preventing financially secure couples from obtaining Medicaid assistance. *See* [H.R.Rep. No. 100–105(II) at 65, 1988 U.S.C.C.A.N. at 888] (bill seeks to "end th[e] pauperization" of the community spouse "by assuring that the community spouse has a sufficient—but not excessive—amount of income and resources available").

To achieve this aim, Congress enacted a set of requirements for states to follow when allocating a couple's income and resources. *Blumer,* 534 U.S. at 480, 122 S.Ct. 962. To ensure that the community spouse has sufficient income to meet his or her basic needs, one requirement reserves to the community spouse a "minimum monthly maintenance needs allowance (MMMNA)." *Id.* at 481, 122 S.Ct. 962 (citing § 1396r–5(d)(3)). The MCCA provides that the MMMNA is determined by multiplying the federal poverty level for a couple by a percentage set by each state. § 1396r–5(d)(3)(A)–(B).

If a community spouse's income does not equal or exceed the MMMNA, the amount of the shortfall is "deducted" from the income of the institutionalized spouse—reducing the amount of income that would otherwise be considered available for the institutionalized spouse's care—so long as that income is actually made available to the community spouse. *Blumer,* 534 U.S. at 481–82, 122 S.Ct. 962 (citing § 1396r–5(d)(1)(B)). The provision for this allowance ensures that income transferred from the institutionalized spouse to the community spouse "to meet the latter's basic needs" is not also considered available for the former's care. *Id.* at 482, 122 S.Ct.

962. As a result of such transfer, the Medicaid program pays a larger portion of the institutionalized spouse's medical bill than it would absent the CSMIA.[2] *Id.*

The availability of CSMIA is determined by applying definitions contained in the MCCA. The MCCA first defines an institutionalized spouse as an individual who

> (A) is in a medical institution or nursing facility or who (at the option of the state) is described in section 1396a(a)(10)(A)(ii)(VI) of this title [which includes someone who receives HCBS], and

> (B) is married to a spouse who is not in a medical institution or nursing facility.

42 U.S.C. § 1396r–5(h)(1) (2010). The "option" contained in subparagraph (A) permits states to expand the definition of an institutionalized spouse.

The MCCA separately defines a community spouse simply as "the spouse of an institutionalized spouse." § 1396r–5(h)(2). Under the federal definitions, Koehler qualified for CSMIA because (1) her husband met the definition of an institutionalized spouse, by virtue of being in a nursing home and being married to a spouse who was not in a nursing home, and (2) she met the definition of a community spouse because she was married to an institutionalized spouse.

In order to implement the medical assistance program in compliance with the MCCA, and to calculate the MMMNA, Colorado adopted spousal impoverishment provisions. *See* § 25.5–6–101(2)(a), C.R.S.2010. The statute directed the Department to ensure that when an institutionalized spouse is eligible for medical assistance, the community spouse retains a CSMIA. *Id.* The statute authorized the state Medical Services Board to promulgate rules to implement the provisions of the statute in accordance with the MCCA. § 25.5–6–101(3).[3]

---

**2.** In Koehler's situation, when her monthly income of $657 was subtracted from the MMMNA, the result exceeded Mr. Koehler's Social Security income. Accordingly, all but $50 (a personal needs allowance) of Mr. Koehler's monthly benefits of approximately $850 was paid to Koehler as a spousal allowance.

**3.** The term "state department" as used in this statute means the Colorado Department of Health Care Policy and Financing, the respondent in this case. § 25.5–1–103(8). The "state board" as used in the statute means the Medical Services Board created under section 25.5–1–301. *See* § 25.5–1–103(7).

The Colorado statute also redefined a community spouse, adopting a definition broader than the federal definition, as:

> the spouse of a person in an institution or nursing facility, the spouse of a person who is enrolled in the PACE program[4] ... or the spouse of a person who is receiving home- and community-based services pursuant to this article.

§ 25.5–6–101(1)(a). Under this definition alone, Koehler is a "community spouse" because she is the spouse of a person in an institution.

The Colorado statute, consistent with the federal statute, initially defines an "institutionalized spouse" as "an individual who is in an institution or nursing facility who is married to a spouse who is not in an institution or nursing facility." § 25.5–6–101(1)(d)(I).

Part II of the Colorado definition of an "institutionalized spouse," consistent with the "option" granted in subparagraph (A) of 42 U.S.C. § 1396r–5(h)(1), states:

> For purposes of this section, "institutionalized spouse" includes an individual who is enrolled in the PACE program ... or is receiving home- and community-based services pursuant to this article, and *who is married to a spouse who is not enrolled in the PACE program or receiving home- and community-based services.*

§ 25.5–6–101(1)(d)(II) (emphasis added). By exercising the option granted in subparagraph (A) of the federal statute, Colorado effectively expanded the definition of institutionalized spouse because it allows a person receiving HCBS to qualify as an institutionalized spouse even though he or she is not truly institutionalized. However, under the second clause of the section (the italicized language above), the individual receiving HCBS and living in the community would not qualify as an institutionalized spouse unless

his or her spouse is not receiving HCBS or PACE benefits.

Under its authority to adopt rules, the Department varied from the federal definition of "community spouse," adding additional provisions and redefining a community spouse in the Colorado Code of Regulations as someone who:

1. Is not in a medical institution or Long Term Care institution,

2. Is not enrolled as a Medicaid Assistance client in ... PACE

3. *Is not receiving Home and Community Based Services (HCBS)*

4. Is not in receipt of Medical Assistance other than coverage under a Medicare cost-sharing program ...

§ 8.112D, 10 Code Colo. Regs. 2505–10 (emphasis added).[5]

## II. Proceedings Below

Because Koehler was receiving HCBS, the Department determined that under the regulatory definition of "community spouse" she was ineligible for the CSMIA she had been receiving. Through correspondence, the Department notified Koehler that pursuant to section 8.112D.3 she could not retain both benefits, and gave her the option of keeping one of the benefits, but not both. She chose the spousal allowance. On July 25, 2008, Koehler requested a hearing to review her benefits termination.

The administrative law judge (ALJ) upheld the determination, finding that (1) Koehler's spouse was not an "institutionalized spouse" under the definition contained in section 25.5–6–101(1)(d)(II) because his spouse was receiving HCBS, and if her husband was not an institutionalized spouse, Koehler was not a community spouse; and (2) section 8.112D.3 expressly excluded Koehler from the definition of a community spouse. The Department upheld the decision of the ALJ based

---

**4.** The Program of All-inclusive Care for the Elderly (PACE) is a Medicare/Medicaid managed care system that provides health care and support services to persons 55 years of age and older. Its goal is to assist frail individuals to live in their communities as independently as possible by providing comprehensive services depending on their needs. *See* http://www.colorado.gov/cs/Satellite/HCPF/HCPF/1217844457059.

**5.** Department regulations were reorganized and renumbered after the date of the notice of action taken against Ms. Koehler. Both Koehler and the Department reference section 8.112 of the Colorado regulations which was in effect at the time; that section is now renumbered section 8.100.7K.

on application of section 8.112D.3, stating that because Koehler received HCBS, she did not meet the definition of a community spouse.

Pursuant to section 24–4–106(7), C.R.S. 2010, Koehler sought judicial review by the district court. She requested her benefits be reinstated. She separately sought to stay the Department's attempt to collect approximately $800 in alleged overpayments of her HCBS. The court denied all of Koehler's requests. Within twenty-four hours of the court's decision, Koehler's husband died, terminating her spousal allowance, but triggering reinstatement of her HCBS. However, because the Department is continuing to seek reimbursement of the previously paid HCBS, the case is not moot.

### III. Standard of Review

■ This court reviews de novo an agency's statutory and regulatory interpretations. *See Nededog v. Colo. Dep't of Health Care Policy & Financing*, 98 P.3d 960, 962 (Colo.App.2004); *Ohlson v. Weil*, 953 P.2d 939, 941 (Colo.App.1997). An administrative agency's determination can be reversed if the agency erroneously interpreted the law. *See McClellan v. Meyer*, 900 P.2d 24, 29 (Colo. 1995). A "state agency's determination of the procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency." *Houghton v. Reinertson*, 382 F.3d 1162, 1168 (10th Cir. 2004) (citing *Amisub, Inc. v. Colorado Dep't of Social Servs.*, 879 F.2d 789, 796 (10th Cir.1989)). "In passing on the validity of a state Medicaid plan under federal law, the court must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations...." *Amisub*, 879 F.2d at 795.

### IV. Discussion

Koehler seeks appellate review of the district court's order pursuant to the Administrative Procedure Act, section 24–4–106(9). On appeal, she argues the Department violated federal Medicaid law when it applied the Department's regulatory definition of community spouse and directed that she elect between her HCBS and the community spousal allowance. She contends that the Colorado regulatory definition of community spouse conflicts with federal law and is therefore preempted. In response, the Department contends that the federal definition of community spouse does not preclude application of the Department's definition of community spouse under the doctrine of cooperative federalism.

■ We first note that the ALJ's determination that Koehler's husband was not an institutionalized spouse under section 25.5–6–101(1)(d)(II) overlooks the fact that her husband met the statutory definition of institutionalized spouse under section 25.5–6–101(1)(d)(I) because he was in an institution and was married to a spouse not in an institution. We read parts I and II of section 25.5–6–101(1)(d) to be in the disjunctive; that is, they are alternative ways to identify an institutionalized spouse. The ALJ apparently read the two sections together.

Because Koehler's husband met the definition in part I, and Koehler herself met the statutory definition of a community spouse because she was spouse of a person in an institution, the ALJ erred to the extent he concluded that Koehler was not eligible as a community spouse under the application of the statute alone.

As noted, however, the ALJ and the Department also concluded that Koehler was ineligible as a community spouse based on the regulatory definition found at section 8.112D.3. Koehler argues that the regulatory definition is invalid under principles of cooperative federalism and it is to that argument we now turn.

### A. Cooperative Federalism

■ Cooperative federalism is a doctrine that "allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Houghton*, 382 F.3d at 1173 (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). The federal Medicaid statute is designed to advance

this principle of cooperative federalism. *Blumer*, 534 U.S. at 495, 122 S.Ct. 962. When interpreting statutes structured under cooperative federalism, states are given a range of choices where "such latitude is consistent with the statute's aims." *Id.* Leeway for state choices is characteristic of Medicaid. *Id.*

■■■ Although Medicaid implicates principles of cooperative federalism, traditional preemption analysis still applies. *Weatherbee ex rel. Vecchio v. Richman*, 595 F.Supp.2d 607, 617 (W.D.Pa.2009), *aff'd*, 351 Fed.Appx. 786 (3d Cir.2009). "Once the state voluntarily accepts the conditions imposed by Congress, the Supremacy Clause obliges it to comply with federal requirements." *Id.*

In *Blumer*, the Supreme Court upheld Wisconsin's decision to employ an "income first" method rather than a "resource first" method for calculating community spouse resource allowance (CSRA) eligibility under the MCCA. 534 U.S. at 496, 122 S.Ct. 962. The federal statute allowed an increase in the CSRA if the spouse could show at a "state administered hearing" that she would not be able to maintain a minimum level of income after an institutionalized spouse gained Medicaid eligibility. In determining whether a higher CSRA was justified, the state had to employ either a resource first or income first method. Wisconsin chose an income first method. *Id.* at 478, 122 S.Ct. 962. The Supreme Court found this consistent with the principle of cooperative federalism, even though the income first method takes account of a potential CSMIA and makes it less likely that the CSRA will be increased. *Id.* at 484, 122 S.Ct. 962. The Court noted that the Secretary of the Department of Health and Human Services had preliminarily determined that the MCCA permitted both the income first and resource first methods, *id.* at 496, 122 S.Ct. 962, and that eliminating a state's discretion to choose would hinder the state's efforts to strike its own balance in the implementation of the Act. *Id.* at 497, 122 S.Ct. 962.

In *Houghton*, the court upheld Colorado's decision to include self-funded retirement accounts held by a community spouse as resources for the purposes of determining an institutionalized spouse's Medicaid eligibility. *Houghton*, 382 F.3d at 1173. The court held that given the MCCA's failure to explicitly require or prohibit inclusion of retirement accounts in calculating a couple's resources, the MCCA did not take a "clear position" and therefore "Congress intended, through cooperative federalism, to leave resolution of this complicated matter to the states." *Id.*

We note that in both *Blumer* and *Houghton*, the states were mandated by MCCA to take action. In *Blumer*, the state had to determine whether a higher CSRA would be allowed. In *Houghton*, the state had to determine eligibility. The ultimate question presented in those cases was whether the actions taken by those states was inconsistent with a clear direction given by Congress. Because they were not, the actions of Wisconsin and Colorado were upheld.

■■■ Both Koehler and the Department rely on the delineation of cooperative federalism expressed in *Blumer* and *Houghton* to support their respective arguments. However, here, unlike the situations in *Blumer* and *Houghton*, the Department's modification of the definition of "community spouse" was not mandated by the MCCA. To be sure, the General Assembly modified the federal definition of institutionalized spouse by electing the option allowed under the federal definition of that term. But it is unclear, and the Department has not explained, why the General Assembly added the second clause of section 25.5–6–101(1)(d)(II). Yet, the Department states it redefined "community spouse" in its regulations primarily for fiscal reasons.

On the basis of the record before us, we conclude that the Department's definition of "community spouse" is inconsistent with a clear direction of Congress embodied in the MCCA's definition of "community spouse" and thus conflicts with the principle of cooperative federalism. Therefore, the Department impermissibly promulgated section 8.112D.3.

### B. Application of Cooperative Federalism

We start from the premise that the articulated purpose of the CMSIA is to transfer

income from an institutionalized spouse, however defined, to the spouse remaining in the community to assist that spouse in meeting his or her "basic needs." Although the statute and case law do not define those basic needs, it is inferred that they include subsistence necessities such as housing, food, and medical costs. The House report states that the purpose of the spousal allowance is to assure that the community spouse "has income and resources sufficient to live with independence and dignity." *See* H.R. No. 100–105(II), 100th Cong., 2d Sess. at 69 (1988), *reprinted in* 1988 U.S.C.C.A.A.N. 857, 888.

The federal definition clearly requires the community spouse to be a person remaining in the community, and not in a medical institution or nursing home. 42 U.S.C. § 1396r–5 (h)(1)(B). This is only logical, for if the spouse is in an institution, the maintenance needs described above would not be present.

The federal definition of institutionalized spouse articulated in 42 U.S.C. section 1396r–5(h)(1) expressly authorizes the states, at their option, to modify subparagraph A of the definition of institutionalized spouse to include a person receiving HCBS. Colorado exercised the option when it adopted the first clause of section 25.5–6–101(1)(d)(II). Under this permissible statutory modification to the federal definition, a spouse remaining in the community could receive the spousal allowance even if his or her "institutionalized spouse" remained at home while receiving HCBS. This is consistent with the premise for the spousal allowance. Just because the institutionalized spouse's income was not going to a nursing home, but instead was going to pay for home-based services,[6] the at-home spouse should not lose the spousal allowance needed to meet basic needs.

However, Colorado also effectively modified subparagraph (B) of the federal definition of institutionalized spouse, 42 U.S.C. § 1396r–5(h)(1)(B), by adding the second clause to section 25.5–6–101(1)(d)(II), which reads *"who is married to a spouse who is not enrolled in the PACE program or receiving home- and community-based services."* Unlike the express language in subparagraph (A) of section 1396r–5(h)(1), there is no express authority granted to the states to modify subparagraph (B). And unlike the modification to subparagraph (A), which broadens the definition of an institutionalized spouse, the modification to subparagraph (B) narrows the definition of an institutionalized spouse.

While the federal definition of institutionalized spouse allows states to modify subparagraph (A), there is no such option in subparagraph (B) of the federal definition. Koehler contends that by expressly permitting subparagraph (A) of the federal definition of institutionalized spouse to be modified by the states, while not expressly permitting modification to subparagraph (B) of the federal definition, Congress expressed a clear intention that subparagraph (B) should not be modified. Koehler argues that because section 8.112D.3 precludes her from qualifying as a community spouse purely by receipt of her HCBS services, the Department impermissibly narrowed the definition of an institutionalized spouse contrary to the intent of subparagraph (B) of the federal definition. In addition, she argues that there is no authority for the Department's modification of the definition of "community spouse" in section 8.112.D3, and therefore we must conclude that the modification is inconsistent with Congressional intent.

In contrast, the Department contends that by not taking a clear position as to what effect the selection of the option under subparagraph (A) would have on the definition in subparagraph (B), Congress intended to leave resolution of this issue up to the states. And, it argues, because Medicaid is a cooperative program, the federal government intended to allow states to enact laws that fit each state's specific fiscal needs. The Department posits that Colorado's fiscal goals necessitate precluding both spouses from receiving Medicaid benefits, or what the Department terms "double-dipping," which is accomplished by preventing a HCBS recipi-

---

6. Under certain circumstances, an individual receiving home- and community-based services may be required to pay the state for those services out of all income remaining after application of the federally allowed allowance. *See* § 25.5–6–309, C.R.S.2010.

ent from also receiving the spousal allowance, even if he or she lives in the community.

In order to determine whether the state law and regulation are consistent with the intent of Congress, we consider the state modifications to the federal definitions in light of the governing purpose of the CSMIA. Both parties agree, and the legislative history is clear, that the basic premise of the CSMIA is to give the spouse remaining in the community a spousal allowance, before funds are taken to pay the institution, in order to meet his or her basic needs. Conversely, the Congressional intent is equally clear based on the definitional structure and language, that if both spouses are in a nursing home or institution, there is no reason for a spousal allowance as neither spouse remains in the community.

As noted above, Koehler's husband met the federal definition of an institutionalized spouse because he was in a nursing home and was married to a spouse "not in a nursing home." 42 U.S.C. § 1396r–5(h)(1). He also met the state statutory definition of institutionalized spouse under section 25–5.6–101(1)(d)(I) on the same basis. He was not an institutionalized spouse by application of the second part of the definition contained in section 25–5.6–101(1)(d)(II), that is, a spouse receiving HCBS.[7]

Koehler met the federal and state statutory definitions of a community spouse because she was the spouse of an institutionalized spouse. Thus, a spousal allowance was due to her. The Department, however, precluded such a result by applying section 8.112D.3.

We conclude that section 8.112D.3 conflicts with the intent of Congress because it precludes the at-home spouse of a person in a nursing facility from receiving a spousal allowance solely because the at-home spouse is receiving HCBS. Despite the fact that she is receiving HCBS, Koehler remains a spouse in the community. She is not in a medical institution or nursing facility, and she was married to an institutionalized spouse whose entire income could be taken to pay the

nursing facility if no spousal allowance was first deducted. Therefore, she should qualify for a CSMIA. The Department cannot conclude that she does not qualify simply because she receives HCBS.

HCBS provide for care specific to the recipient's disabilities. They do not pay for basic needs, such as rent and food. Koehler received a CSMIA to assist her in taking care of those basic needs, and her status as an HCBS recipient should not disqualify her from receiving that assistance. Moreover, the HCBS she received were not necessarily provided without cost; HCBS recipients must pay for the HCBS out of any income they may have. There is no reason to believe that Koehler no longer needed the spousal assistance solely because she was an HCBS recipient.

Furthermore, even if the receipt of HCBS would render Koehler herself an "institutionalized spouse" under the definition contained in section 25.5–6–101(1)(d)(II), and cause her husband to be defined as a "community spouse" under section 25.5–6–101(1)(a) (because he was the spouse of a person receiving HCBS), he would not be eligible to receive the spousal allowance. This is so because the regulation initially defines "community spouse" as a spouse "not in a medical institution." § 8.112D.1. That part of the regulation is consistent with the Congressional intent, and indeed is exactly what is provided in 42 U.S.C. § 1396r–5(h)(1)(B). In other words, the provision of section 8.112D.3 is not necessary to prevent the dual payment of spousal allowances in a case such as Koehler's.

Koehler's predicament is what Congress intended to prevent with the implementation of spousal allowances—leaving a community spouse financially destitute because of the costs of her spouse's nursing care. Accordingly, precluding an at-home spouse, like Koehler, from receiving a CSMIA purely by virtue of her own receipt of HCBS, violates the MCCA's Congressional intent.

---

7. He did not meet the definition of institutionalized spouse under section 25.5–6–101(1)(d)(II) because his wife was receiving HCBS, but as we concluded above, these statutes must be read in the disjunctive.

**1182**

Although cooperative federalism permits states to enact their own Medicaid laws, states must still do so within the confines of the federal scheme. Section 8.112D.3 falls outside these confines by violating the underlying intent of the federal CSMIA provisions, and therefore cannot be applied as written. It may be consistent with Congressional intent to adopt a regulation that addresses the situation where two spouses would otherwise be entitled to spousal allowances from each other, but this regulation goes too far by depriving a community-based spouse of the allowance in a situation where there is no issue of dual allowances.

## V. Conclusion

Applying section 8.112D.3, to the extent it precludes an at-home community spouse from receiving a spousal allowance solely because she is also receiving HCBS, is inconsistent with the Congressional intent in providing for a CSMIA. The application of the regulation to deny HCBS to Koehler is a denial of a right contrary to law in contravention of section 24–4–106(7) and (11)(e), C.R.S. 2010, and therefore may not be applied.

We reverse the decision of the district court, and hold that Koehler's HCBS benefit was wrongfully deemed to be terminable. Accordingly, we hold that no overpayment from Koehler is due to be repaid to the Department, and that any benefits that were withheld from her based on the Department's determination must be restored.

The judgment is reversed.

Judge LOEB and Judge RUSSEL, concur.